UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL EDWARDS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-01000-JMS-MJD |
| | ) | |
| INDIANA UNIVERSITY, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

*Pro se* Plaintiff Michael Edwards, who is African American, was a Clinical Associate Professor at Defendant Indiana University ("IU"). After a student complained that Mr. Edwards had engaged in inappropriate conduct with her, IU investigated the allegations and ultimately terminated Mr. Edwards' employment with IU. Mr. Edwards initiated this litigation against IU in March 2019. [Filing No. 1.] IU has filed a Motion for Summary Judgment, [Filing No. 30], and a Motion to Strike Late Response to Motion for Summary Judgment, [Filing No. 35], both of which are now ripe for the Court's decision.

### I.
### MOTION TO STRIKE LATE RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Because IU's Motion to Strike relates to the information that the Court will consider when deciding the Motion for Summary Judgment, the Court considers the Motion to Strike at the outset.

### A. Background

IU filed its Motion for Summary Judgment on January 6, 2020, [Filing No. 30], along with a Notice Regarding Right to Respond to and Submit Evidence in Opposition to Motion for Summary Judgment (the "Notice"), [Filing No. 32]. IU filed the Notice, and served it on Mr.

Edwards, pursuant to Fed. R. Civ. P. 56 and due to Mr. Edwards' *pro se* status.  The Notice advised Mr. Edwards that he had the right to file a response to the Motion for Summary Judgment, summarized several requirements for the response, and provided that:

> You must file and serve a copy of your response to the motion for summary judgment by February 6, 2020, or by other such date ordered by the court.  If you need more time to respond, you must file a motion with the court asking for more time before the deadline expires.  The court may, but is not required to, give you more time.

[Filing No. 32 at 1-2.]  Mr. Edwards did not seek any extensions of time to file his response to the Motion for Summary Judgment, but did not file his response until March 23, 2020 – forty-six days after the deadline.  [Filing No. 34.]

### B.  Discussion

In its Motion to Strike, IU argues that "[d]espite having received…clear and unequivocal notice that his response was due by February 6, 2020, and that he must file a motion with the court asking for more time to respond before the deadline expires if he needed additional time, Edwards filed his response over six weeks past the deadline – 46 days past to be exact, having never sought additional time to respond."  [Filing No. 35 at 1-2 (emphasis omitted).]  IU contends that Mr. Edwards' *pro se* status "does not relieve him of his litigation duties, and he must comply with orders and schedules."  [Filing No. 35 at 2.]

Mr. Edwards has not responded to IU's Motion to Strike.

"We live in a world of deadlines," *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996), and the Court may, in its sound discretion, strike filings that fail to comply with the deadlines set by applicable rules, *Cleveland v. Porca Co.*, 38 F.3d 289, 298 (7th Cir. 1994). However, courts also strongly prefer to resolve issues on the merits.  *See Schilling v. Walworth Cnty. Park & Planning Comm'n*, 805 F.2d 272, 275 (7th Cir. 1986).  The Court **DENIES** IU's

Motion to Strike Late Response to Motion for Summary Judgment, [Filing No. 35], so that it may decide the Motion for Summary Judgment on the merits.[1]

## II.
### MOTION FOR SUMMARY JUDGMENT

**A.  Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

---

[1] On the same day that it filed its Motion to Strike Mr. Edwards' response brief, IU filed a Motion for Extension of Time to File Reply.  [Filing No. 36.]  The Court granted the Motion for Extension of Time, ordering that IU would have 14 days from the date the Court rules on IU's Motion to Strike to file a reply in support of its Motion for Summary Judgment.  [Filing No. 37.]  As discussed below, the Court finds based on IU's Motion for Summary Judgment and Mr. Edwards' response thereto, that all of Mr. Edwards' claims fail as a matter of law.  Accordingly, the Court has ruled on the Motion for Summary Judgment without the need for IU to file a reply brief.

facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### B. Statement of Facts

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### 1.  Mr. Edwards' Employment at IU

IU hired Mr. Edwards in May 2000 as a Visiting Assistant Professor in the School of Public and Environmental Affairs ("SPEA").  [Filing No. 31-1 at 2; Filing No. 31-19 at 7.]  Mr. Edwards served as a Clinical Assistant Professor in SPEA from July 2003 through July 2011.  [Filing No. 31-1 at 2; Filing No. 31-19 at 6.]  From July 2011 to April 2018, he was a Clinical Associate Professor in both SPEA and the Department of Chemistry.  [Filing No. 31-1 at 2; Filing No. 31-19 at 6.]

### 2.  IU's Sexual Misconduct Policy

While Mr. Edwards was an IU employee, IU had a Sexual Misconduct Policy in place (the "Policy").  The Policy contained the following provisions:

> Procedures for Responding to Incidents Involving Allegations of Faculty or Staff Sexual Misconduct
>
> The University will promptly respond to all complaints of Sexual Misconduct alleged against a University employee.  Any individual reporting that they have been a victim of sexual violence will be informed of how to, and provided assistance in, making a criminal complaint with the appropriate law enforcement agency.  Individuals who identify as victims/survivors and all members of the Indiana University community are also encouraged to visit the Stop Sexual Violence website at http://stopsexualviolence.iu.edu<http://stopsexualviolence.iu.edu> for more information on reporting, campus resources and services available on their campus.
>
> All parties will have equal opportunities to present information, have advisors present, and pursue an appeal, if applicable.  All procedures, excluding any appeal, should be completed within 60 days, absent any special circumstances.
>
> Throughout this process, the University will have as a priority, the interests of all parties involved, in regard to fairness, dignity, privacy, and due process.  Students reporting sexual misconduct against an employee will be provided interim and remedial measures as described in this policy, where appropriate and necessary.
>
> For the purpose of these procedures, relevant officials with key responsibilities are:
>
> **Investigator** – The Deputy Title IX Coordinator(s) for the respective campus, or an appropriate designee, will conduct fact-finding as the Investigator and may

coordinate with other offices such as human resources, academic affairs, and student affairs.

**Decisional Official (DO)** – The DO will issue the decision determining responsibility and assigning appropriate sanctions, if applicable. The DO will be as follows:

\*          \*          \*

For complaints against faculty and academic employees, the DO will be the Vice Provost/Vice Chancellor for Academic Affairs of the respective campus.

[Filing No. 31-23 at 2-3.]

The Policy further states:

**Complaint**
*Initial Assessment:* Upon receipt of a report alleging that a faculty or staff member has engaged in sexual misconduct, an Investigator will conduct an initial assessment to determine whether it falls within the scope of the Sexual Misconduct Policy, and whether it rises to the level of an allegation of sexual misconduct. If a complaint raises allegations that are outside the scope of the Sexual Misconduct Policy, but may violate other University policy(ies), the Investigator will refer the complaint to the appropriate University office….

**Investigation**
If an investigation is initiated, the Investigator will conduct fact-finding as to the allegations made against the respondent employee.

The investigation may include, but is not limited to, interviews with the complainant, the respondent, and other witnesses identified as having information relevant to the allegations made, as well as the examination of written statements by the parties, relevant documents, and other relevant information. Information for the investigation may be provided by complainant, respondent, witnesses identified by any party, or the University. The Investigator shall ensure that the respondent has been informed of all allegations raised and the name of the complainant(s), and is provided the opportunity to respond.

[Filing No. 31-23 at 3-4.]

As to the results of an investigation, the Policy provides:

**Report of Investigation**
The Investigator will create a report at the conclusion of their investigation setting forth:

1.  the specific allegation(s);

2.  the respondent's response to the allegation(s);

3.  a summary of the relevant information gathered from the parties, witnesses and other sources;

4.  an analysis of the information;

5.  a recommendation as to whether the respondent is responsible or not responsible for the alleged violation(s) of the Sexual Misconduct Policy, using a preponderance of the evidence standard (more likely than not); and

6.  a recommendation as to appropriate sanctions, if any, as set forth below.

The report will be forwarded to the DO.  The parties shall also be provided access to the report, and shall be provided 10 calendar days to submit any comments to the DO in writing.

**Finding and Decision**
Upon receiving the Investigator's report, and any comments received from either party, the DO shall issue a finding.  The DO may consult with the Investigator concerning the investigation and recommendations.  If the DO wishes further consultation with the parties, the Investigator will facilitate consultations to ensure equal opportunities for the parties to meet with the DO.

The DO will issue one of the following findings, using a preponderance of the evidence standard:

Finding of "No Violation" of the University's Sexual Misconduct Policy:
If there is a determination that the behavior alleged and investigated did not violate the Sexual Misconduct Policy, the DO shall provide the parties written notice of the finding.  In the event the investigation reveals that the employee may have violated a different University policy, the DO may address any such potential violation through other applicable University policies.  Documentation regarding a finding of "No Violation" shall be maintained with the respective Deputy Title IX Coordinator's office, and not in the employee's personnel file.

Finding of a "Violation" of the University's Sexual Misconduct Policy:
If there is a determination that the behavior alleged and investigated was in violation of the Sexual Misconduct Policy, the DO shall issue the finding and sanction(s) (based on the level of sanctions set forth below).

The DO shall provide the parties written notice of the finding and any sanctions if applicable.

[Filing No. 31-23 at 5-6.]

Sanctions for a violation of the Policy can range from those that do not "directly modify job duties or actual salary," such as requiring additional training, all the way to termination. [Filing No. 31-23 at 6.]

Upon a finding of "Violation" coupled with imposition of a "level two" sanction (which can include termination):

[A]ny party may request an appeal to the Appellate Officer [(the "AO")] on the basis of:

1. Significant procedural error that reasonably would have affected the outcome;

2. Significant bias in the process;

3. The finding of responsibility is not supported by the evidence in the Report of Investigation; and/or

4. The appropriateness of the sanctions.

[Filing No. 31-23 at 6.]

A request for an appeal "must be submitted in writing to the [AO] within 10 calendar days of receiving the DO's decision. The request must set forth the basis for seeking an appeal, and include information to support such basis(es)." [Filing No. 31-23 at 7.] The AO for an appeal by a faculty member is the Provost of the campus where the faculty member is employed. [Filing No. 31-23 at 3.] The AO "shall review the findings, and any applicable sanctions, in making a decision[, and] shall make a final determination within 10 calendar days of the receipt of any appeal" either affirming the DO's original findings, setting aside the original findings and imposing a new finding and/or sanction, or setting aside the original findings and ordering a new investigation. [Filing No. 31-23 at 7.]

After a decision by the AO, a faculty member may request a review by the Faculty Board of Review ("FBR").  [Filing No. 31-23 at 3; Filing No. 31-23 at 7.]  The FBR may then affirm the AO's decision, recommend an alternative finding and/or sanction, or recommend that the determination be set aside and a new investigation take place.  [Filing No. 31-23 at 8.]  Within ten calendar days of receiving the FBR's recommendation, the AO will make a final determination either affirming the prior decision on appeal, setting aside the prior determination and imposing a new finding and/or sanction, or setting aside the prior determination on appeal and ordering a new investigation.  [Filing No. 31-23 at 9.]  The Policy provides that "[i]f the FBR recommends that the AO's prior determination be modified, but the AO affirms the prior determination, the final determination shall be made by the [IU] President."  [Filing No. 31-23 at 9.]

### 3.  *Prior Allegations of Inappropriate Conduct by Mr. Edwards*

Prior to the allegations in December 2017 regarding inappropriate conduct by Mr. Edwards which are the focus of this lawsuit, IU had received complaints from several other students, including:

- In March 2013, a student, A.J., reported that she was in the SPEA Café getting coffee when Mr. Edwards (a stranger to her) approached her and asked if he could get her a cup of coffee.  She declined, and he then began asking her personal questions including her age, area of study, and how long she had been at IU.  When A.J. told Mr. Edwards that she had to leave, Mr. Edwards was very persistent and said "I can't let you go yet."  Mr. Edwards asked A.J. to email him, which she later did.  Mr. Edwards asked her via email to have coffee when he returned from a trip, then emailed again to say he had not ended up going on the trip.  A.J. did not respond to his emails, and reported her encounter to IU.  Mr. Edwards was notified of the complaint and told not to have any further contact with A.J.

- In April 2014, Mr. Edwards was teaching a group exercise class for the Student Recreational Sports Center at IU when a student taking the class, S.K., complained that Mr. Edwards gave her undue attention during the class and placed his hands on her hips while demonstrating proper form for an exercise.  During another session, Mr. Edwards again singled out S.K. and put his hands on her hip area twice.  At the end of the class, Mr. Edwards asked S.K. to stay

afterwards and they were alone in the exercise room. Mr. Edwards asked S.K. to demonstrate an exercise that involved her getting on her hands and knees. When she did so, Mr. Edwards again touched her hip areas and her buttocks. S.K. gave him a stern look and got up to leave, and Mr. Edwards insisted that she shake his hand. He then held her hand for an uncomfortably long period of time, and proceeded to shake her hand five times. IU Student Recreational Sports Center administrative staff discussed the complaint with Mr. Edwards and he was given a written warning.

- Also in April 2014, a graduate student in the English Department, P.P., complained regarding several interactions she had with Mr. Edwards. During the spring of 2014, Mr. Edwards approached P.P. in the central atrium of the Herman Wells Library, told her she was pretty, asked if she was from India, said he had seen her at the gym, asked her name, and said he wanted her email and last name. He continued talking to P.P., despite the fact that P.P. was rude to him. He saw her in Starbucks and again began to talk to her, asking if P.P. liked ethnic food and if she would like to go shopping with him to an ethnic grocery store in Indianapolis. P.P. did not verbally respond, and he told her the ball was in her court, and returned a few minutes later and told her the ball was in her court again. P.P. did not respond, and began going to a different Starbucks. When Mr. Edwards appeared at the new Starbucks, P.P. was concerned. Later that month, P.P. was sitting in a restaurant on Kirkwood when one of the people she was with told her that there was a man staring at her through the window. It was Mr. Edwards. P.P. saw Mr. Edwards on two other occasions when he tried to talk to her, and on one of those occasions he touched P.P.'s elbow. Each time, P.P. moved away from Mr. Edwards and did not speak to him. She felt like there was nowhere she could go without running into Mr. Edwards.

- In January 2015, an IU employee, S.P., was working at the IU Student Recreational Sports Center when Mr. Edwards, who was acting as a group exercise leader, began bothering her and making her uncomfortable. Mr. Edwards approached S.P., told her how beautiful she was, and asked for her phone number. S.P. told Mr. Edwards that she had a boyfriend and continued working. Mr. Edwards then leaned up very close to S.P. and was very persistent. After S.P. reported the incident, Mr. Edwards was terminated from the Student Recreational Sports Center.

[Filing No. 31-14 at 5-6.]

### 4.   December 2017 Allegations of Inappropriate Conduct by Mr. Edwards

An Investigative Report prepared by Julie Knost, IU's Director of Affirmative Action and

Equal Opportunity, and Sally Ronald, IU's Associate Director of Student Welfare and Title IX,

described IU's initial receipt of allegations of inappropriate conduct by Mr. Edwards:

> On December 7, 2017, the University received an online report submitted by a Residential Assistant [("RA")] in Wright Quad, in that person's role as a responsible employee, concerning allegations by two students against Dr. Edwards. Specifically, the RA's report indicated that Student [N.L.] reported to her RA that her professor, Dr. Edwards, made her "uncomfortable" during class by giving compliments and getting very close to her physically. NL also shared with her RA that her friend, student [A.L.] had also had a recent encounter with Dr. Edwards. The RA followed up with AL and got AL's account. Specifically, AL told the RA that Dr. Edwards had invited her to his house earlier that week for dinner; that Dr. Edwards took her upstairs and asked her to lie on his bed while he massaged her; that he engaged in non-consensual touching of AL's upper thighs, buttocks, and her breast over her clothing; and that Dr. Edwards then proposed that AL enter into a sexual relationship with him.

[Filing No. 31-12 at 1; Filing No. 31-14 at 1.][2]

These allegations prompted IU to initiate an investigation and also to suspend Mr. Edwards with pay from his academic duties pending the conclusion of the investigation into the allegations.

[Filing No. 31-1 at 3; Filing No. 31-1 at 7; Filing No. 31-10 at 1.]

### 5. The Investigation Into the December 2017 Allegations

Ms. Knost and Ms. Ronald met with Mr. Edwards on January 22, 2018, and reviewed the contents of the RA's online report with Mr. Edwards without providing him with the identity of either student. [Filing No. 31-14 at 2.] Mr. Edwards denied all of the allegations, and also denied having ever had a student to his home for dinner. [Filing No. 31-14 at 2.]

On January 29, 2018, Ms. Ronald met with A.L. and A.L. described her interactions with Mr. Edwards. Those details are set forth in an Investigative Report prepared by Ms. Knost and Ms. Ronald:

> AL stated that on the first day of her fall 2017 class with Dr. Edwards, Dr. Edwards gestured for her to come forward to speak with him after class, in a class of roughly

---

[2] The initial Investigative Report stated that IU received the online report of allegations against Mr. Edwards on December 13, 2017. [Filing No. 31-12 at 1.] This was a typographical error, and the date was later corrected to December 7, 2017. [Filing No. 31-2 at 2; Filing No. 31-14 at 1.]

300 students.  AL stated that Dr. Edwards encouraged her to come to his office hours on Monday and Wednesday afternoons, but AL informed him that those office hours conflicted with her class schedule.  AL stated that Dr. Edwards then suggested that they could find another time to meet during the week.

AL stated that she regularly met with Dr. Edwards over the course of the semester, roughly once per week, sometimes in his Chemistry office and sometimes in his SPEA office.  AL stated that they talked about a range of subjects, including the class, their families, and their lives.  AL stated that partway through the semester, Dr. Edwards recommended the book *Jonathan Livingston Seagull* to her and offered to buy it for her from Barnes and Noble.  AL stated that she and Dr. Edwards went to Panera first for lunch before going to Barnes and Noble and ordering the book.

AL stated that after this, during other meetings together, Dr. Edwards began bringing up the idea of cooking a meal for her at his house, but she explained that she would decline the offer and say that she was busy.  AL stated that then, during dead week, Dr. Edwards again asked her to come to his house for dinner and said that it was the best time to do it since it was right before finals week.  AL stated that she felt "pressured" to accept the invitation.  AL stated that that same night she went to Dr. Edwards' SPEA office and waited in his office while he taught a late class elsewhere in the building.

AL stated that Dr Edwards then drove her in his car to pick up a pizza and then to his house.  AL stated that she thought it was weird at the time because Dr. Edwards had bragged about his cooking and that was the reason to have her visit his house.  AL stated that she remembered that Dr. Edwards drove a Cadillac.  AL stated that she was not sure where exactly Dr. Edwards' home was, but she felt that it was not far from the location where he picked up the pizza, which she believed to be Rockit's Pizza.

During this meeting, AL provided [Ms.] Ronald with a detailed description of the interior of Dr. Edwards' house, including specific furniture, art on the walls, and the layout of the rooms.  AL stated that, after dinner, Dr. Edwards showed her the upstairs of his house, including his bedroom.  AL described the bedroom as having a large bed, large closet, and a large mirror on the wall across from the bed.

AL stated that Dr. Edwards told her that she should sit down on the bed and she asked him why.  AL stated that Dr. Edwards told her that she could trust him and there was no reason she should feel uncomfortable.  AL stated that after she sat down on the bed, Dr. Edwards then asked her to lie down and spread out her arms and legs.  AL stated that she again asked Dr. Edwards why she should do this, and told [Ms.] Ronald that Dr. Edwards responded similarly that she could trust him.  In the meeting with [Ms.] Ronald, AL described how she felt at this time as if she was "in a movie" and was not sure what Dr. Edwards would do if she said no to him.  AL explained that she was thinking that she was not close to campus, that Dr.

12

Edwards had driven her there and she was not sure where she would go if she tried to get away.

Once she had spread out on the bed, AL stated that Dr. Edwards said that he wanted to give her a foot massage.  AL stated that Dr. Edwards began by rubbing her feet, but then began rubbing her legs higher and higher and eventually rubbing her thighs.  AL told [Ms.] Ronald that she felt "really uncomfortable" at this point.  AL stated that Dr. Edwards told her to roll over onto her stomach.  AL stated that she again asked why and Dr. Edwards gave her a similar answer saying that he would not hurt her.  AL stated that, once she was on her stomach, Dr. Edwards began rubbing her legs again and began rubbing her buttocks.  AL stated that Dr. Edwards then asked her to roll back over and when she did, he placed his hand up her hoodie and massaged her breast over her bra.

AL stated that Dr. Edwards then stopped touching her and sat on the floor.  AL stated that Dr. Edwards began asking her what she thought of him and if she had ever seen herself with an older man.  AL stated that Dr. Edwards complimented her and told her that he did not want a relationship with her, but that she could come over and they could just "have fun" together.  AL stated that she told Dr. Edwards she did not see that happening.  AL stated that Dr. Edwards then told her that he wanted to have sex with her but had too much respect for himself to force himself on her.  AL stated that Dr. Edwards expanded on this thought, and told her that he would not tell students to sleep with him to get a good grade because he has too much respect for himself.

AL stated that Dr. Edwards then drove her back to Wright.  AL stated that the only other communication she had with Dr. Edwards after that night was a text from him that stated "Best on all your final exams" on December 12, 2017.  Overall AL's account was consistent with what she had described to her RA in the original December 2017 report.

During the meeting, AL informed [Ms.] Ronald that she had texted with her roommate before going to Dr. Edwards' house and a few times while she was in his home because she was worried about what would happen.  AL provided these texts to [Ms.] Ronald…on February 13, 2018.  In a text to her roommate on December 4, 2017, AL states that she is going to Dr. Edwards' house and says "he's mentioned it before but if anything happens to me you know where I was lol" and later, "He said he just wants to talk for a bit.  Which is fine I trust him.  But like I said if anything happens you know where I was lol."  Later that evening, AL's roommate texted her while was still at Dr. Edwards' house to check in, and AL responded "He ain't right girl" and later "I think after chemistry ends…I'm never talking to him again."

[Filing No. 31-14 at 2-4.]

On March 7, 2018, Ms. Ronald, IU's Senior Associate General Counsel Kip Drew, Mr. Edwards' advisor, and Mr. Edwards met to discuss the allegations.  [Filing No. 31-14 at 4.]  Prior to the meeting, Mr. Edwards had been informed by email of A.L.'s identity and that the encounter about which A.L. complained had taken place on December 4, 2017.  [Filing No. 31-14 at 4.]  At the March 7, 2018 meeting:

> Dr. Edwards again denied the allegations…. Dr. Edwards stated during the meeting that he believed AL was not doing well in his class and that she came from a very troubled background, but reaffirmed his prior statement that the events as alleged did not happen.  Dr. Edwards stated that he knew AL and met with her multiple times to discuss the class and life, that he may have recommended a reading to her, but that she had not come to his house.  Dr. Edwards denied all the allegations, including specifically denying that he ever had a student come to his home for dinner.

[Filing No. 31-14 at 2.]

In his deposition in this case, Mr. Edwards confirmed many details that A.L. had provided during her meeting with Ms. Ronald and Ms. Knost regarding Mr. Edwards' car and home, including:

- That Mr. Edwards' car was a Cadillac;

- That Mr. Edwards' home has a world map on the wall;

- That Mr. Edwards' home has a master walk-in closet;

- That Mr. Edwards' home has a fireplace with photographs above it;

- That Mr. Edwards' home has a dining room to the left upon entering the front door, with a wooden table in it; and

- That Mr. Edwards keeps beverages in his garage.

[Filing No. 31-1 at 10-11.]

On March 26, 2018, the Investigative Report was provided to Eliza Pavalko, IU's Vice Provost for Faculty and Academic Affairs.  [Filing No. 31-2 at 2.]  In the Investigative Report, Ms.

Knost and Ms. Ronald recommended Mr. Edwards' termination.  [Filing No. 31-14 at 7.]  Mr. Edwards was also provided with a copy of the Investigative Report, and responded to Vice Provost Pavalko on April 5, 2018.  [Filing No. 31-1 at 13; Filing No. 31-13.]  Mr. Edwards vehemently denied all of the allegations against him in his response to the Investigative Report, and also stated that he believed he was being discriminated against due to his race.  [Filing No. 31-13.]  He stated, in part:

> I deny that I engaged in any inappropriate conduct with NL and/or AL. Specifically, I did not give inappropriate compliments and/or get physically close to NL.  Moreover, I did not invite AL to my home for dinner nor did AL come to my home for dinner.  As AL was never in my home, I did not touch AL physically nor did I ask AL to enter into a sexual relationship.  Any and all allegations relating to NL and AL are patently false.  Moreover, all of the prior allegations are false as well.  I have never engaged in any inappropriate conduct with any student, staff member or faculty member.
>
> I believe I am being discriminated against on the basis of my race, African-American.  I am the only African-American professor in the Chemistry Department, and I am only one (1) of four (4) African-Americans in [SPEA]….

[Filing No. 31-13 at 3-4.]

Thereafter, A.L. was provided a copy of Mr. Edwards' response, and she emailed Vice Provost Pavalko stating that Mr. Edwards was not being truthful and that "[e]verything [she] detailed in [her] report is true."  [Filing No. 31-15.]  On April 9, 2018, Vice Provost Pavalko "determined that [A.L.'s] allegations were credible and true and that [Mr.] Edwards' behavior violated the University's Sexual Misconduct Policy and also constituted serious personal misconduct."  [Filing No. 31-3 at 2.]  Accordingly, she "made the decision to discharge [Mr.] Edwards for cause pursuant to the University's policy on Permanent Separations for Academic Appointees, effective April 19, 2018 and notified [Mr.] Edwards accordingly."  [Filing No. 31-3 at 2.]  Vice Provost Pavalko averred:

> My decision to discharge [Mr.] Edwards for cause was in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any. Further, I had no reason [to] doubt that the allegations against [Mr.] Edwards[ ] were true and, in fact, did then and still do believe them to be true. Additionally, I had no reason to doubt that the investigation done by [Ms.] Knost and [Ms.] Ronald, and their subsequent investigative report and recommendation were in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any.

[Filing No. 31-3 at 2-3.]

### 6. *Mr. Edwards' Appeal of Vice Provost Pavalko's Decision*

On April 18, 2018, Mr. Edwards appealed Vice Provost Pavalko's decision to terminate him to IU's Provost and Executive Vice President, Lauren Robel. [Filing No. 31-1 at 18; Filing No. 31-4 at 1-2; Filing No. 31-4 at 4-7.] Provost Robel reviewed Mr. Edwards' appeal, the Investigative Report, and the underlying materials from the investigation, and affirmed Vice Provost Pavalko's decision to terminate Mr. Edwards for cause. [Filing No. 31-4 at 2.] Provost Robel's decision "was in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any." [Filing No. 31-4 at 2.] Additionally, Provost Robel "had no reason to doubt that the allegations against [Mr.] Edwards[ ] were true and, in fact, did then and still do believe them to be true." [Filing No. 31-4 at 2.] Provost Robel also "had no reason to doubt that Vice Provost Pavalko's decision was in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any," and also "had no reason to doubt that the investigation done by [Ms.] Knost and [Ms.] Ronald, and their subsequent investigative report and recommendation were in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any." [Filing No. 31-4 at 2.]

### 7.  *Mr. Edwards' Request for FBR Review*

On April 30, 2018, Mr. Edwards requested that the FBR review Provost Robel's decision to affirm Vice Provost Pavalko's termination decision.  [Filing No. 31-5 at 2; Filing No. 31-5 at 4-8.]  The FBR was comprised of five IU Professors – Judah Cohen, Lessie Jo Frazier, Jody Madiera, Peter Kloosterman, and Barbara Dennis.  [Filing No. 31-5 at 2.]  Vice Provost Pavalko responded to Mr. Edwards' request for FBR review on May 29, 2018.  [Filing No. 31-5 at 17-22.] After reviewing Mr. Edwards' request for review, Vice Provost Pavalko's response, and other documents that were submitted, the FBR issued a unanimous decision on June 25, 2018 which concurred with Vice President Pavalko's decision to discharge Mr. Edwards.  [Filing No. 31-5 at 2; Filing No. 31-5 at 42-43.]

Each FBR member's decision was "in good faith, [was] truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any."  [Filing No. 31-5 at 2; Filing No. 31-6 at 1-2; Filing No. 31-7 at 1-2; Filing No. 31-8 at 1-2; Filing No. 31-9 at 2.] Additionally, each FBR member had no reason to doubt that Vice Provost Pavalko's termination decision and Provost Robel's decision to affirm Vice President Pavalko's termination decision were made "in good faith, [were] truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any."  [Filing No. 31-5 at 2; Filing No. 31-6 at 1; Filing No. 31-7 at 1-2; Filing No. 31-8 at 1-2; Filing No. 31-9 at 2.]  The FBR members also had no reason to doubt that the investigation done by Ms. Knost and Ms. Ronald, and their Investigative Report, "were in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any."  [Filing No. 31-5 at 2; Filing No. 31-6 at 1-2; Filing No. 31-7 at 2; Filing No. 31-8 at 2; Filing No. 31-9 at 2.]

#### 8.  *Provost Robel's Re-Affirmation of the Termination Decision*

On June 28, 2018, Provost Robel re-affirmed her prior determination to affirm Vice Provost Pavalko's termination decision, which finalized Mr. Edwards' discharge from IU for cause. [Filing No. 31-4 at 2; Filing No. 31-4 at 16.]  The re-affirmation was based on the FBR's decision and Provost Robel's prior decision, and provost Robel "had no reason to doubt that the [FBR's] decision was in good faith, truthful, and had nothing to do with [Mr.] Edwards's race or prior claims of alleged discrimination, if any."  [Filing No. 31-4 at 2.]

#### 9.  *Mr. Edwards' Equal Employment Opportunity Commission Charge*

Mr. Edwards filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC Charge"), and filed his "Attachment to Charge of Discrimination" as an exhibit to his Amended Complaint, but not the EEOC Charge itself.  [Filing No. 17; Filing No. 17-1 at 1-2.]  In the Attachment to Charge of Discrimination, Mr. Edwards states that:

- He was discharged from IU's Chemistry Department in January 2010 after receiving an "unprofessional and offensive" letter from IU.  Another faculty member felt that Mr. Edwards should be evaluated for a promotion as any other faculty member would be, and formed a promotion committee.  The Chemistry Department ultimately recommended and supported Mr. Edwards' promotion.  Mr. Edwards then submitted a dossier to SPEA for consideration of a promotion in that department.

- SPEA denied Mr. Edwards a promotion in the fall of 2010, Mr. Edwards appealed the decision, and the appeal was denied.  He requested a promotion again in 2011, was again denied, appealed, and the appeal was denied.  He was told his dossier documents "were not all together" and, once that issue was remedied, the Vice Provost, the Provost, IU's President, and the IU Board of Trustees all supported his promotion in SPEA.

- Sometimes faculty members in the Chemistry Department made inappropriate comments to Mr. Edwards.  When Mr. Edwards said hello to a faculty member, the faculty member responded, "Some of us have to work around here."  When Mr. Edwards said to another faculty member, "Great minds!  How are you doing?," the faculty member responded, "What are you doing here?"

- In 2012, the Associate Dean of SPEA halted Mr. Edwards' discretionary funds for minority outreach, attempted to change Mr. Edwards' contract from 12 months to 9 months without notice, and terminated the internship program that Mr. Edwards started in Jamaica West Indies for SPEA graduate students.

- Mr. Edwards filed a complaint with Provost Robel in 2016 after the Co-Chair of the Chemistry Department screamed at him and stated, "Call me by my f***ing name" after a discussion of class assignments based on race. Mr. Edwards' complaint resulted in a requirement that IU conduct training on "racial climate," but Mr. Edwards does not know if the training ever took place.

- After resigning from an administrative role for a $5 million grant from the National Science Foundation, Mr. Edwards was suspended four months later, on December 7, 2017, "based on false allegations…." He "vehemently denied the allegations and still den[ies] them to this day." Although IU's Policy requires that an investigation be completed within 60 days absent any appeals, the investigation into the allegations against Mr. Edwards was not completed until 123 days after the initial complaint was received. The complainant did not meet with investigators until 53 days after the initial report of misconduct.

- Mr. Edwards "was ultimately terminated from [IU] on April 19, 2018 after a biased investigation against [him]. [He] believe[s he] was discriminated and retaliated against on the basis of [his] race, African-American. [He] was the only African-American professor in the Chemistry Department, and [he] was only one (1) of four (4) African-Americans in [SPEA].

[Filing No. 17-1 at 1-2.] The EEOC issued a Right to Sue Letter to Mr. Edwards on December 20, 2018. [Filing No. 17-1 at 3.]

### 10. Mr. Edwards' Lawsuit

Mr. Edwards filed his initial Complaint on March 12, 2019 against IU and Carol Barnett, who Mr. Edwards described as IU's Senior Associate General Counsel, with his "Attachment to Charge of Discrimination" as an exhibit. [Filing No. 1; Filing No. 1-1.] He filed the operative Amended Complaint on May 21, 2019, which is substantially the same as his initial Complaint and also attaches the "Attachment to Charge of Discrimination" as an exhibit, but does not name Ms. Barnett as a defendant. [Filing No. 17; Filing No. 17-1.] Mr. Edwards appears to allege claims for race discrimination and retaliation. [See Filing No. 17-1.]

19

**C. Discussion**

Mr. Edwards does not reference the statutes under which he brings his discrimination and retaliation claims. [Filing No. 17.] IU has assumed that Mr. Edwards brings his discrimination and retaliation claims under both 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, [*see* Filing No. 33 at 14], and the Court does the same.

*1. Section 1981 Claims*

IU argues that, to the extent Mr. Edwards brings his claims under § 1981, those claims are barred because IU is entitled to immunity. [Filing No. 33 at 15-16.] IU asserts that it is an instrumentality of the state, entitled to Eleventh Amendment immunity, and that there is no evidence to suggest that IU has waived immunity or otherwise consented to the lawsuit. [Filing No. 33 at 16.]

Mr. Edwards does not address IU's immunity argument in his response. [*See* Filing No. 34.]

Eleventh Amendment immunity bars suits against states and their agencies regardless of whether the relief sought is monetary damages or injunctive relief. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). "A state and its agencies cannot be subject to a federal suit without the state's consent…, and this bar applies with full force to claims under § 1981…." *Haynes v. Ind. Univ.*, 902 F.3d 724, 731 (7th Cir. 2018) (citing *N. Ins. Co. of N.Y. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006) and *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1184 (7th Cir. 1982)). Additionally, "[Indiana University] and its Board of Trustees are state agencies for sovereign-immunity purposes." *Haynes*, 902 F.3d at 731 (citing *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007)); *see also Feresu v. Ind. Univ. Bloomington*,

2015 WL 5177740, at *3 (S.D. Ind. 2015) ("IU is an 'instrumentality,' 'arm,' or 'alter ego' of the

State of Indiana for purposes of the Eleventh Amendment"); *Shannon v. Bepko*, 684 F. Supp. 1465,

1473 (S.D. Ind. 1988) ("Indiana University is an instrumentality of the state such that it is entitled

to assert Eleventh Amendment immunity").

Because IU is a state agency, and since it has not consented to being sued in federal court,

Mr. Edwards' claims against IU – to the extent they are brought under § 1981 – are barred by

Eleventh Amendment immunity.  *McDonough Assoc., Inc. v. Grunloh*, 722 F.3d 1043, 1049 (7th

Cir. 2013) ("[T]he general rule is that private individuals are unable to sue a state in federal court

absent the state's consent").  IU's Motion for Summary Judgment as it relates to discrimination

and retaliation claims brought under § 1981 is **GRANTED**.

       2.  *Title VII Claims*

Mr. Edwards appears to bring claims for discrimination and retaliation under Title VII, and

the Court addresses each claim in turn.  Mr. Edwards alleges that IU discriminated against him

based on the following:

- His discharge from the Chemistry Department in early 2010;

- His denial of a promotion in SPEA in fall 2010;

- Comments from faculty members in the Chemistry Department that he viewed as "inappropriate";

- In 2012, SPEA halting his funding for minority outreach, attempting to change his contract from 12 months to 9 months without notice, and ending an internship program that he started;

- In 2016, the Co-Chair of the Chemistry Department screaming "Call me by my f***ng name";

- His treatment relating to A.L's allegations, including that it took IU 123 days to complete its investigation instead of 60 days, that A.L. did not meet with investigators for 53 days after the initial report, that the initial Investigative Report stated that the initial report was made on December 13, 2017 but it was

actually on December 7, 2017, and that he was terminated "after a biased investigation."

[Filing No. 17-1; Filing No. 34.]

The Court finds at the outset, that Mr. Edwards' allegations related to his treatment by IU before December 2017 (when A.L. accused Mr. Edwards of misconduct) are time-barred, and cannot form the basis for Mr. Edwards' claims in this lawsuit. A claimant must file a charge with the EEOC within 180 days of an allegedly discriminatory act, 42 U.S.C. § 2000e-5(e), or within 300 days "if a claimant initially institutes proceedings with a state or local agency that possesses the authority to address the alleged discrimination," *Black v. Rieth-Riley Constr. Co., Inc.*, 957 F. Supp. 177, 180 (S.D. Ind. 1997). This deadline "protect[s] employers from the burden of defending claims arising from employment decisions that are long past." *Id.* (internal quotation and citation omitted). Once the claimant receives a right to sue letter from the EEOC, he must file a lawsuit within 90 days of receipt of the right to sue letter. [*See* Filing No. 17-1 at 3 (Mr. Edwards' Right to Sue Letter).] There is no evidence that Mr. Edwards' allegations related to his treatment by IU before December 2017, when A.L. brought her allegations to IU's attention, were included in the EEOC Charge that resulted in the Right to Sue Letter. Accordingly, any claims related to those allegations would fail as a matter of law because Mr. Edwards has not shown that he exhausted his administrative remedies. And, even if they were included, Mr. Edwards' EEOC Charge as to those allegations – which relate to events which took place more than 180 days before the EEOC Charge was filed – would have been untimely.

The only allegations Mr. Edwards may rely on in this case, and for which he has shown that he exhausted his administrative remedies, relate to IU's handling of A.L.'s accusations and IU's discipline and ultimate termination of Mr. Edwards due to those allegations. The Court considers Mr. Edwards' discrimination and retaliation claims in turn, within those parameters.

a.  Discrimination Claim

IU argues that Mr. Edwards has failed to establish a *prima facie* case of race discrimination because he has not shown that a similarly situated employee not in a protected class was treated more favorably.  [Filing No. 33 at 17-18.]  IU also contends that it has established a legitimate, nondiscriminatory reason for Mr. Edwards' discharge – namely, that he violated the Policy by "engaging in inappropriate nonconsensual sexual contact with his student."  [Filing No. 33 at 19.] It asserts that there is no evidence that Mr. Edwards' discharge was pretextual, and that "[i]t is clear that [Mr.] Edwards does not have any evidence of discrimination beyond his own subjective belief that some factor other than his sexual misconduct with a student (and his own history of similar inappropriate behavior on at least four occasions) must be the reason for his termination." [Filing No. 33 at 20.]  IU notes that Mr. Edwards was asked during his deposition whether he had evidence of pretext, and "never could articulate the basis for his belief that the University was motivated by race in the termination decision beyond stating simply that it was his belief." [Filing No. 33 at 20.]  IU argues that Mr. Edwards, at best, thinks the decision to discharge him was wrong due to his belief that A.L.'s allegations were false, and that Mr. Edwards himself admits that if the allegations were true, discharge would be justified.  [Filing No. 33 at 21.]  It asserts that Mr. Edwards testified at his deposition that he thinks IU believed A.L.'s allegations, and that "the extent of [Mr.] Edwards's position is simply that the University was wrong in concluding he engaged in sexual misconduct with a student and therefore it must be discrimination because of his race."  [Filing No. 33 at 22.]  Finally, IU addresses Mr. Edwards' claim that IU violated its own procedures in investigating A.L.'s allegations, arguing that it complied with the Policy and that even if it had not, "this is simply not evidence of racial discrimination by the University." [Filing No. 33 at 22.]

In his response, Mr. Edwards states that he has attached documents "to show evidence of unfair treatment before, during and after [his] promotion," that he has witnesses he can call to support his case, and that he is "asking the court to have a public hearing so [his] case can be heard." [Filing No. 34 at 2.] The attached documents include a list of "evidence," copies of several emails and letters, and some handwritten notes. [Filing No. 34 at 3-13.]

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating against any individual with respect to his "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To survive summary judgment on a Title VII discrimination claim, a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (quotation and citation omitted). In discrimination cases, "'the sole question that matters' is causation: whether a statutorily proscribed factor caused [the adverse employment action]." *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Ortiz v. Werner Enterprises Inc.*, 834 F.3d 760, 764-65 (7th Cir. 2016)). A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent. *Joll*, 953 F.3d at 929. A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]," "[t]o clarify and to simplify [his] task." *Joll*, 953 F.3d at 929 (quotation and citation omitted). The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). In determining whether the evidence would permit a reasonable factfinder to conclude that

24

Mr. Edwards' race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted). But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 Fed. App'x 608, 610 (7th Cir. 2019).

Mr. Edwards relies on two theories in support of his discrimination claim: (1) that IU violated the Policy by taking too long to investigate A.L.'s allegations; and (2) that because A.L.'s allegations were not true, his termination was motivated by race. Neither theory saves his discrimination claim.

First, there is no evidence that IU's investigation violated the Policy, as Mr. Edwards claims. Its investigation did take more than 60 days, but that was in compliance with the Policy which provides that "[a]ll procedures, excluding any appeal, should be completed within 60 days, *absent any special circumstances*." [Filing No. 31-23 at 2 (emphasis added).] In her April 20, 2018 decision on Mr. Edwards' appeal, Provost Robel explained the "special circumstances" that warranted additional time, including that: (1) a Resident Advisor, not A.L., made the initial report, requiring the Title IX officer to then contact A.L. and determine whether she wanted to proceed with an investigation; and (2) A.L. responded to the Title IX officer on December 13, 2017, but did not meet with the investigators until January 29, 2018 due to final exams and semester break. [Filing No. 31-18 at 4-5.] Provost Robel noted that "[f]rom the time [A.L.] spoke to the Title IX investigators until the March 26, 2018 investigative report was released was less than 60 days," and that "[t]he revised report, issued on April 9, corrected a single fact." [Filing No. 31-18 at 4.]

Second, whether A.L.'s allegations were actually true is irrelevant.  The correct focus is whether IU believed that the allegations were true, and whether that belief formed the basis for IU's decision to terminate Mr. Edwards.  Although "[a]n inference of discrimination may follow when the employer's purported nondiscriminatory reason for taking an adverse action against the employee was pretextual, meaning it was 'a lie' or 'a phony reason,'" *de Lima Silva v. Dept. of Corrections*, 917 F.3d 546, 561 (7th Cir. 2019), Mr. Edwards has not presented any evidence showing that IU somehow relied on A.L.'s allegations as a cover-up for discriminating against him based on his race.  To show pretext, Mr. Edwards would need to "'identify such weaknesses, implausibilities, inconsistencies, or contradictions'" in IU's reasons for terminating him "'that a reasonable person could find [those reasons] unworthy of credence.'" *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)).  Mr. Edwards has not presented any evidence indicating pretext, such as "shifting or inconsistent explanations" for the treatment he received from IU.  *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003).  And tellingly, Mr. Edwards testified at his deposition that he has no evidence that IU did not believe A.L.'s allegations, [Filing No. 31-1 at 22], and that he believes that IU found A.L.'s allegations to be truthful and "[t]hat's why they did what they did," [Filing No. 31-1 at 19].  Mr. Edwards even went so far as to testify that if A.L.'s allegations were true, they would justify his termination.  [Filing No. 31-1 at 22 ("Q: If the allegations by [A.L.] were true, do you believe it would have justified your termination?  A: If the allegations were true, would it justify my termination?  Yeah, if they were true").]

As to whether there is any evidence that race was a motivating factor in IU's decision to terminate Mr. Edwards, the Court notes that Mr. Edwards relies solely on his belief that race was a motivating factor in IU's handling of A.L.'s allegations and the decision to terminate Mr.

Edwards.  [*See, e.g.,* Filing No. 31-1 at 6 (Mr. Edwards testifying at his deposition that "I believe I was discriminated because I'm black.  I believe.  That's what I say, I believe.  I didn't say they discriminated because I was, I said I believe…").]  But Mr. Edwards' belief that race was a factor in IU's treatment of him – without more – is not enough to survive summary judgment on his race discrimination claim.  *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011) ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed") (quotation and citation omitted).

Additionally, while "[d]iscrimination may be inferred when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class," *de Lima Silva*, 917 F.3d at 559, Mr. Edwards has not put forth any evidence indicating that was the case.  In fact, he testified at his deposition that he did not have any such evidence. [Filing No. 31-1 at 22 (in response to a question at his deposition regarding whether he could point to anyone similarly situated who was treated more favorably by IU, Mr. Edwards testified "I don't know of anyone I can speak of myself").]

In sum, glaringly absent from this case is any evidence whatsoever that IU's handling of A.L.'s allegations and Mr. Edwards' treatment and ultimate termination were based in any way on race.  Accordingly, the Court **GRANTS** IU's Motion for Summary Judgment on Mr. Edwards' Title VII race discrimination claim.

b.  <u>Retaliation Claim</u>

IU argues that Mr. Edwards's sexual misconduct with a student caused his termination, and that Mr. Edwards "has set forth absolutely no evidence that his termination was in retaliation for anything."  [Filing No. 33 at 23.]  It asserts that there is no evidence that IU's investigation and

termination of Mr. Edwards "were a guise to cover up retaliation for something [Mr.] Edwards did." [Filing No. 33 at 23-24.]

Mr. Edwards does not address IU's arguments related to his retaliation claim in his response.

To survive summary judgment on his retaliation claim, Mr. Edwards must present evidence showing that "'[he] suffered a materially adverse action because [he] engaged in protected activity.'" *Lloyd*, 761 Fed. App'x at 611-12 (quoting *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016)). The questions is "whether the evidence produced would permit a reasonable factfinder to conclude [Mr. Edwards' race] caused the discharge." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

Mr. Edwards has not presented any evidence to show that he was terminated because he engaged in protected activity. In fact, as discussed above, he testified that he thought IU believed A.L.'s allegations and that if the allegations were true, his termination would be justified. [Filing No. 31-1 at 19; Filing No. 31-1 at 22.] Mr. Edwards himself acknowledges that IU terminated him because it had concluded that A.L.'s allegations were true, and not because Mr. Edwards engaged in statutorily protected activity. The lack of evidence indicating otherwise dooms Mr. Edwards' retaliation claim, and the Court **GRANTS** IU's Motion for Summary Judgment on that claim.

### III.
### CONCLUSION

Based on the foregoing, the Court finds that IU is entitled to Eleventh Amendment immunity on Mr. Edwards' § 1981 race discrimination and retaliation claims, and that Mr. Edwards' Title VII race discrimination and retaliation claims fail as a matter of law. The Court **DENIES** IU's Motion to Strike Late Response to Motion for Summary Judgment, [35], and **GRANTS** IU's Motion for Summary Judgment, [30]. Final judgment shall enter accordingly.

Date: 4/29/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**<u>Distribution via United States Mail to</u>:**

Michael Edwards
1516 West Edinburgh Bend
Bloomington, IN 47403

**<u>Distribution via ECF only to all counsel of record</u>**